IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| TODD PROVSTGAARD,<br><br>                    Plaintiff,<br><br>v.<br><br>IHC HEALTH SERVICES, INC. dba<br>INTERMOUNTAIN HEALTHCARE,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:14-cv-00117-RJS<br><br><br>Judge Robert J. Shelby |

Plaintiff Todd Provstgaard claims that his former employer, Defendant IHC Health Services, Inc. ("Hospital"), discriminated and retaliated against him based on his disabilities in violation of the Americans with Disabilities Act. Provstgaard also contends that the Hospital failed to reasonably accommodate his disabilities. The Hospital now moves for summary judgment on Provstgaard's claims against it. For the reasons stated below, the court grants the Hospital's motion.

## BACKGROUND[1]

Plaintiff Todd Provstgaard is a registered radiographer and sonographer with over twenty-five years' experience as an echocardiograph and vascular ultrasound technician. An ultrasound technician takes ultrasound scans of a patient's heart and peripheral vascular system as ordered by the patient's treating physician to detect health problems, such as blood clots and aneurysms. After taking these scans, the technician prepares a report that includes measurements taken from

---

[1] Because this matter is before the court on a motion for summary judgment, the court views the evidence and draws reasonable inferences in the light most favorable to Provstgaard as the nonmoving party. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1213 (10th Cir. 2015).

the images and descriptions of what the technician sees in the images. A reviewing physician reviews and signs the report if he or she finds no significant issues with it. The reviewing physician then gives the report to the treating physician, who uses the information in it to diagnose and prescribe a treatment plan for the patient.

A technician's failure to correctly identify an issue or to take the correct image can have serious implications for patient care and safety. For example, if a technician fails to identify a blood clot or an aneurysm, and the treatomg physician fails to identify these errors, then a patient may suffer a heart attack or a stroke.

While Provstgaard was working as an ultrasound technician in 2007, he suffered either a stroke or a series of seizures that, along with blood clots in his legs and pulmonary embolisms, caused him to be in a coma for a week and to suffer from debilitating health issues. As a result, he went on short-term disability leave until January 2008.

After returning to work for a few months, Provstgaard went on long-term disability leave in November 2008 after suffering from recurring embolisms and blood clots. He also suffered from short-term memory loss; difficulty differentiating between letters and numbers; and degenerative neuropathy, impairing his ability to use his right hand and arm. He again received long-term disability benefits in spring 2009 based on a severe cognitive impairment, and he was unable to work from 2009 to 2011 due to his deteriorating health. He eventually received Social Security Disability benefits as well.

Provstgaard's condition began to improve after he underwent cervical spine fusion surgery in October 2011. After the surgery, he saw significant improvement in his right hand and arm, as well as in his ability to speak clearly and tell the difference between letters and numbers. His short-term memory improved to the point that he could remember conversations for an hour

or two.  But he still needed to receive instructions more than once.  And he continued to experience difficulty with his long-term memory.

As a result of his improvement, Provstgaard felt like he could return to work under the right conditions.  In late 2011, he applied for a part-time echocardiograph technician position at Intermountain Medical Center in Murray, Utah.  He received an interview for the position in December 2011.  Heather Rayburn, the Director of Echocardiograph and Vascular Services, Lisa Cannon, the Vascular Coordinator, and Mike Gonzales, the Echocardiograph Lab Coordinator, attended the interview.

Provstgaard discussed during the interview his vast experience as an echocardiograph and vascular technician.  He also told the interviewers that he had suffered a stroke, that he had some difficulty using his right hand, and that he had not worked for some time.  But he told them that he believed he could perform the functions of the job "with the understanding that there would be latitude given for [him], [his] training, and learning of [his] limitations."[2]  He also told them that he would not know all his limitations until he actually tried performing the job, and that he would need to be given instructions and taught the protocols more than once due to his memory issues.  And according to his testimony, "assurance was given that there would be latitude given more so than average to work through those limitations."[3]

The Hospital decided not to hire anyone for the position at the time due to budgetary restrictions, but it later posted another echocardiograph technician position in early 2012.  Again, Provstgaard applied.  And again, Rayburn, Cannon, and Gonzales interviewed him.  This time, Provstgaard told them that the functionality of his right hand had improved due to a surgery he underwent after the first interview.  Rayburn stated that his right hand appeared to be much better

---

[2] Todd Provstgaard Depo. (Dkt. 57, Ex. A), at 73:11–15.
[3] *Id.* at 75:17–19.

this time, and Cannon testified that she was no longer concerned about the condition of his right hand after the second interview.

Rayburn discussed with Provstgaard the possibility of him splitting his time between the echocardiograph and vascular departments, instead of working only in echocardiograph as the job posting indicated.  The Hospital then reposted the position as a joint echocardiograph-vascular position, and offered it to Provstgaard.  Provstgaard accepted the position knowing that it required him to work in both departments.

At either the first or the second interview, Provstgaard told Rayburn that he had short-term memory loss.  He testified that it was therefore "implied that additional time or training, or a broader latitude of training would occur."[4]  It is undisputed, however, that he never requested an accommodation through the Hospital's formal process.

Provstgaard worked at the Hospital for ten weeks from early April 2012 to June 11, 2012. He worked eight shifts in April—four in the echocardiograph department and four in the vascular department.  He spent his first two days receiving orientation—one day each in the echocardiograph department and the vascular department.  He then spent three days shadowing employees in the echocardiograph department and another three days shadowing employees in the vascular department.  Gonzales led the training sessions in the echocardiograph department, while Cannon led the sessions in the vascular department.

During these sessions, Provstgaard asked questions about the equipment, the patients, and the examinations.  The other employees, Gonzales, and Cannon were all available to answer any questions he may have had.  Provstgaard also received and reviewed the protocols for each department, which were slightly different than the protocols he had followed in other facilities.

---

[4] *Id.* at 173:15–18.

For instance, he had never scanned certain bundles of veins in the lower extremities as the Hospital's protocols required. Nor had he performed an ejection fraction using the so-called Simpson method. As a result, the Hospital's protocols for performing these examinations were new to him. To help him learn these and other protocols, Cannon reviewed all the protocols for the vascular department with him on one or two occasions. Copies of the protocols were also available to all technicians in the lab and online.

Provstgaard began performing scans on May 1, 2012. But he did not do so on his own. He instead continued to work with another employee on all but a few occasions in May and into June because his supervisors did not trust him to work alone. Cannon testified that she scheduled an extra employee to work and earn overtime when Provstgaard was working because "things had gone so poorly" and she "really felt like patients were at risk."[5] Indeed, Provstgaard had missed blood clots, labeled an aorta an aneurysm when it was not, and failed to properly scan certain veins. He also left work early one afternoon in May to go to a dentist appointment without notifying anyone.

In an effort to help him correct these errors, Cannon talked to Provstgaard several times about missing blood clots and met with him at least twice to review his work and provide extra coaching on how to improve. Cannon and Rayburn also met with Provstgaard in May to discuss his errors. And Gonzales held coaching sessions with Provstgaard in late May and early June.

Cannon assigned another employee, Matt Halvorson, to serve as Provstgaard's mentor and review his images for a day when she was out of town. Halvorson reported that he had to make changes on five out of the seven studies Provstgaard performed that day. Even though he did not tell Provstgaard that he made those changes, Cannon talked to Provstgaard about those

---

[5] Lisa Cannon Depo. (Dkt. 51, Ex. 7), at 41:18–42:2.

issues at a later meeting.  Halvorson noted that Provstgaard rarely asked any questions despite

being told that he could do so.  Provstgaard disputes this, and testified that he asked coworkers

for help with certain protocols and scans, but was turned away several times.  In any event,

Halvorson stated the following in an email that he sent to Cannon:

> It's very frustrating working with [Provstgaard], because most techs (including
> myself) feel they need to babysit him and watch his every move.  It's hard to
> trust [Provstgaard] while working with him because of the frequency of
> mistakes on both the scanning and reporting side of things.  I feel like he is a
> liability if he is scanning by himself right now . . . .[6]

Other coworkers who trained Provstgaard and reviewed his work likewise testified that they

were concerned about his mistakes to the point that they did not feel comfortable with him

scanning or preparing reports on his own.[7]

Although the amount of training a new technician receives is variable and depends on the

particular technician, Provstgaard received substantially more training than other technicians

with similar experience.  A similarly experienced technician would ordinarily receive about two

weeks of training in each of the echocardiograph and vascular departments.  That training would

include working with other technicians so the new employee could ask questions and become

comfortable taking scans and preparing reports alone.  Provstgaard, however, received this and

additional training during his entire ten weeks at the Hospital.  One coworker testified that he

was not aware of any technician with Provstgaard's experience that received as much training as

him.  And another coworker testified that she "felt as though all [we] did was train him."[8]

Despite receiving additional training, Provstgaard's performance did not improve and he

---

[6] Matt Halvorson May 25, 2012 Email to Lisa Cannon (Dkt. 51, Ex. 8).

[7] *See, e.g.*, Decl. of Amy Jensen (Dkt. 51, Ex. 19), ¶¶ 5–8 ("I worked personally with Mr. Provstgaard, and I was concerned about the mistakes he was making to the degree that I did not think it was wise for him to perform scans or prepare reports that were not supervised or reviewed by another technologist.).

[8] *Id.* ¶ 5.

instead continued to commit errors.  The Medical Director of the Hospital's Peripheral Vascular Department testified that "[t]he clinical errors committed by Mr. Provstgaard were alarming in their frequency, magnitude and clinical importance," and that the frequency of his mistakes "is beyond anything I have ever experienced, causing me to be greatly concerned for patient safety."[9]  Although Gonzales testified that Provstgaard's imaging skills in the echocardiograph department were fine, he also noted that Provstgaard had a pattern of committing measurement errors.  And while these and other errors were correctable, some of them put patients in danger.

As a result, Rayburn presented Provstgaard with a written warning on June 1, 2012.  The warning listed ten errors that Provstgaard committed in May.  A sample of those errors includes reporting a severely reduced ejection fraction as "normal," reporting a severe carotid stenosis as "mild," reporting that a patient had a large aortic aneurysm when a follow up scan showed that none existed, and performing incomplete venous exams.[10]  Rayburn stated in the written warning that Provstgaard's errors put patients at risk "for incorrect treatment, or not receiving treatment they need."[11]  She also stated that Provstgaard's "manager will continue to monitor and review the progress of his work.  She will hold regular follow up meetings to review this information with him."[12]  Rayburn further stated that Provstgaard was expected to approach "his manager for additional training or assistance in areas that he feels that it is needed."[13]  The warning resulted in no formal disciplinary action, and it did not affect his salary, benefits, or hours.

Provstgaard admitted that, although he received coaching from several individuals before receiving the warning, "[e]very one of these [errors listed in the warning] are the mistakes that I

---

[9] Decl. of Steven Merell, M.D. (Dkt. 51, Ex. 3), ¶ 11.
[10] June 1, 2012 Written Warning (Dkt. 51, Ex. 5).
[11] *Id.*
[12] *Id.*
[13] *Id.*

made, whether it be on the clinical aspect or behavior patterns."[14]  But he nonetheless believed

that "whatever mistakes [he] was making could have been handled through counsel rather than

written disciplinary actions."[15]  And he "was under the impression that rather than receiving a

write-up, it would be more constructive to maybe receive direction."[16]  He notes that "the terms

of [his] hire" were that he would receive more training and time to learn the protocols and go

though the case studies instead of being written up for his errors.[17]  He testified that instead of

providing him with additional training, Rayburn admitted in early May that she had "dropp[ed]

the ball" on his training.[18]  He further testified that he did not approach Rayburn after receiving

the first warning to identify the areas in which he needed more training, because he "was still

working under the impression that [he] was on a trial and error basis."[19]

Provstgaard continued to work alongside a coworker after receiving the warning.  For

instance, the echocardiography research coordinator showed him how to perform a complete

echocardiograph report.  He also spent two days in early June working with a coworker named

Larry Frank.  Frank told Rayburn and Cannon after the first day that Provstgaard performed

suitable compressions, completed reports with minimal errors, and possessed scanning abilities.

But Frank stated that he was still nervous to let Provstgaard perform his own studies in view of

the several errors Provstgaard committed that day.  Indeed, Provstgaard had failed to identify

multiple blood clots, at least one of which should have easily been seen.  Frank also questioned

how well Provstgaard knew the venous anatomy, and said that one study Provstgaard performed

raised a red flag.  Frank reported several more errors after the second day.  Although Provstgaard

---

[14] Todd Provstgaard Depo. (Dkt. 57, Ex. A), at 121:23–24, 123:4–6.
[15] *Id.* at 123:1–4.
[16] *Id.* at 123:6–8.
[17] *See id.* at 127:6–128:5.
[18] *Id.* at 141:21–142:1.
[19] *Id.* at 127:6–128:5.

showed improvement as the second day progressed, Frank reported that his reporting was still unsatisfactory and that he was still struggling to visualize certain clots.

A few days later, on June 11, 2012, Rayburn and a Human Resources representative presented Provstgaard with a final written warning based on five additional errors he committed over a one-week period.  Rayburn again stated that Provstgaard's errors put patients at risk, and that his manager will continue to monitor his progress and hold regular meetings with him. While the warning did not result in his termination, it provided that "[c]ontinued performance concerns will result in termination."[20]

Provstgaard testified that during the meeting he said, "If I am truly putting patients at risk, and I am not providing the quality of standard of care to this facility, then I really have no reason to show up to work on Monday.  Right?"[21]  The Human Resources representative asked him if he would put that in writing.[22]  Provstgaard then resigned and wrote the following on the written warning:

> Health issues have turned out to be more adverse than I have foreseen.  I am not able to perform at the level of quality due to unforeseen disabilities from previous health concerns.  I am not able to continue.  I am appreciative of all the efforts of management and co-workers that reflects genuine concern on my behalf.[23]

Provstgaard testified that he voluntarily resigned, even though there was no indication that his salary, benefits, or hours would have been affected as a result of the final warning.  He testified that he resigned because it seemed like "every mistake that I made was put in a written form.  It seemed like the training or broad latitude that I was expecting to receive, as a result of my trial and error, trying to figure out what my limitations might involve, all took place with

---

[20] Final Written Warning (Dkt. 51, Ex. 1).
[21] Todd Provstgaard Depo. (Dkt. 57, Ex. A), at 158:25–159:4.
[22] *Id.* at 159:4–5.
[23] Final Written Warning (Dkt. 51, Ex. 1).

written disciplinary actions."[24]

Provstgaard stated in later interviews that he resigned from his position at the Hospital because he had yet to learn the full scope of his disability-related limitations, and he was not meeting the position's minimum requirements.  He also told his insurer that he resigned because his "right arm and neck pain were causing problems," he "could not tolerate continued working," and he could not perform the essential functions of his position.[25]

Provstgaard eventually found short-term employment in the sonography field outside of Utah.  He first worked at a facility in Hawaii from August 2012 to November 2012, and then at a facility in Alaska from June 2013 to September 2013.  He represents that he successfully held ultrasound responsibilities at both facilities, yet declined full-time positions so he could return to Utah.

Meanwhile, Provstgaard filed with the Equal Employment Opportunity Commission on April 5, 2013 a charge of discrimination against the Hospital.  He also applied for over twenty positions at the Hospital and other IHC facilities from June 2012 to October 2013.  For example, he applied for multiple ultrasound positions, a part-time cardiac fitness assistant position, a radiology manager position, and a housekeeper position.

As part of IHC's normal hiring procedures, Human Resources asked Rayburn in June 2013 to provide a reference on Provstgaard.  Rayburn ranked Provstgaard's performance as "poor" and recommended that he not be rehired.  A Human Resources employee summarized Rayburn's comments as follows:

> He chose to resign and did officially resign at his Final written warning meeting.  Numerous clinical errors.  Was told that she needed to get rid of him and that he is dangerous.  Numerous situations like, disappearing during shifts

---

[24] Todd Provstgaard Depo. (Dkt. 57, Ex. A), at 162:19–24; *see also id.* at 163:8–10 ("I don't believe I was provided the amount of training or broad latitude as I was under the impression.").

[25] *Id.* at 203:13–15, 222:3–7.

> and no one knew where he was, leaving hours early without anyone knowing. Claimed he wasn't being trained, so they would retrain him, he was retrained numerous times. Huge red flag that he keeps reapplying for different jobs throughout Intermountain. It was a disaster to hire him again. Avalanche of behavior problems and clinical errors. She's really nervous that someone will hire him back. He's not good at remembering things, doesn't retain information.[26]

Rayburn testified that the paragraph cited above accurately reflects how she ranked Provstgaard's performance.

Provstgaard filed with the EEOC on October 17, 2013 another twenty-four charges of discrimination against the Hospital after it declined to hire him for any of the positions for which he applied. He claimed that the Hospital's failure to hire him constituted unlawful discrimination.

Provstgaard then sued the Hospital in February 2014, alleging a number of violations of the Americans with Disabilities Act. He contends that the Hospital discriminated and retaliated against him based on his disability, and failed to engage in the interactive process and reasonably accommodate his disability.[27] He seeks back wages from the date he resigned, June 11, 2012.

## ANALYSIS

The Hospital now moves for summary judgment on all of Provstgaard's claims. The court's analysis proceeds in three parts. First, the court provides the governing legal standard. Second, the court analyzes Provstgaard's disability discrimination claims. And third, the court discusses Provstgaard's retaliation claims. In the end, the court concludes that Provstgaard's claims fail as a matter of law.

---

[26] Reference Form (Dkt. 51, Ex. 10).
[27] Provstgaard also brought a claim for hostile work environment, but he has since withdrawn that claim. (Dkt. 51, at lxiii n.7.)

11

## I.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[28]  "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[29]  If the movant shows that no genuine issue of material fact exists, then the nonmovant must "set forth specific facts from which a rational trier of fact could find" for him.[30] The "nonvovant must identify facts by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[31]  "Unsupported conclusory allegations, however, do not create an issue of fact."[32]

## II.  Disability Discrimination

The court now turns to Provstgaard's disability discrimination claims under the ADA. "The ADA protects individuals with physical disabilities or mental impairments that substantially limit major life activities."[33]  To establish a prima facie case of discrimination, a plaintiff must demonstrate that "(1) he is disabled . . . as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered discrimination as a result of his disability."[34]

---

[28] Fed. R. Civ. P. 56(a).

[29] *Mackenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005) (citation omitted) (internal quotation marks omitted).

[30] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (citation omitted) (internal quotation marks omitted).

[31] *Id.* (citation omitted) (internal quotation marks omitted).

[32] *Mackenzie*, 414 F.3d at 1273.

[33] *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 742 (10th Cir. 2013) (citing 42 U.S.C. § 12102(1)(C)).

[34] *Id.*

If a plaintiff does not offer direct evidence of discrimination, which is the case here, then the court applies the familiar burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*.[35]  Under that framework, a plaintiff must first make out a prima facie case of disability discrimination under the three-part test provided above.[36]  If the plaintiff makes that showing, then "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  If the defendant proffers such a reason, the burden then shifts back to the plaintiff to show that the defendant's stated reasons are merely 'pretextual.'"[37]

Here, Provstgaard contends that he was discriminated against based on his disabilities in three ways.  First, he claims that he was constructively discharged based on his disabilities on June 11, 2012.[38]  Second, he argues that the Hospital failed to engage in the interactive process and reasonably accommodate his disabilities.[39]  And third, he maintains that the Hospital failed

---

[35] 411 U.S. 792, 802–04 (1973); *see, e.g.*, *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011) (applying the *McDonnell Douglas* burden-shifting framework to an ADA claim).

[36] *C.R. England*, 644 F.3d at 1038.

[37] *Id.* (citations omitted); *see also Mackenzie*, 414 F.3d at 1274 (outlining the *McDonnell Douglas* burden-shifting framework in the summary-judgment context).

[38] To establish "discrimination" under the three-part test provided above, "a plaintiff generally must show that he has suffered an 'adverse employment action because of the disability.'" *C.R. England*, 644 F.3d at 1038. Ordinarily, "only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." *Id.* at 1040 (citation omitted) (internal quotation marks omitted).  A plaintiff can establish that he suffered an adverse employment action by showing that he was constructively discharged.  *See Walker v. United Parcel Serv. of Am., Inc.*, 76 F. App'x 881, 889 (10th Cir. 2003) (unpublished).  "Constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." *Mackenzie*, 414 F.3d at 1281.

[39] The ADA defines the term "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).  The statute "establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them." *C.R. England*, 644 F.3d at 1048 (citation omitted) (internal quotation marks omitted).

The Tenth Circuit has adopted a modified burden-shifting framework for failure-to-accommodate claims under the ADA.  To establish a prima facie case, a plaintiff must show "(1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability." *White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir. 1995).  If the plaintiff produces enough evidence to make a facial showing that reasonable accommodation is possible, then "the burden of production shifts to the employer to present evidence of its inability to accommodate." *Id.* at 361.  "If the employer presents such

to rehire him based on Rayburn's discriminatory and negative reference.[40]  The court addresses Provstgaard's first two claims of discrimination together before addressing his failure-to-hire claim.

### A.  Constructive Discharge and Reasonable Accommodation Claims

The Hospital contends that Provstgaard cannot establish a prima facie case of disability discrimination with respect to his constructive discharge and reasonable accommodation claims, because he was not qualified to perform the essential functions of his position with or without reasonable accommodation.  The court agrees.[41]

A disabled individual must be "qualified" to invoke the protections of the ADA.[42]  An individual is qualified if he can, "with our without reasonable accommodation, . . . perform the essential functions of the employment position that such individual holds or desires."[43]  The plaintiff bears the burden to show that he was qualified,[44] and whether he was is a mixed question of law and fact.[45]

Below, the court first discusses whether a reasonable jury could find that Provstgaard was capable of performing the essential functions of his position.  Concluding that a reasonable jury

_____

evidence, the plaintiff may not simply rest on his pleadings.  He has the burden of coming forward with evidence concerning his individual capacities and suggestions for possible accommodations to rebut the employer's evidence."  *Id.* (citation omitted) (internal quotation marks omitted).  The plaintiff bears the "burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability."  *Id.*  Because, as will become evident below, the court concludes that Provstgaard was not qualified to perform the essential functions of the job with or without reasonable accommodations, the court does not engage in this modified burden-shifting analysis.

[40] *See Hillig v. Rumsfeld*, 381 F.3d 1028, 1035 (10th Cir. 2004) (holding that a negative reference can rise to the level of an adverse employment action).

[41] Because the court concludes that Provstgaard was not qualified to perform the essential functions of his position at the Hospital with or without reasonable accommodation, the court does not here address his argument that he suffered discrimination when he was constructively discharged and when he did not receive reasonable accommodation.  The court, however, addresses his constructive discharge claim in the context of his retaliation claim, discussed below.

[42] *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1161 (10th Cir. 1999) (en banc).

[43] 42 U.S.C. § 12111(8).

[44] *Koessel*, 717 F.3d at 743.

[45] *Id.*

14

could not so find, the court then examines whether a reasonable jury could find that Provstgaard could have performed the essential functions of his position with reasonable accommodation.[46]

## 1. Essential Functions

The Hospital argues that Provstgaard could not perform the essential functions of his job as an echocardiograph and vascular technician. "A job function is 'essential' if it is fundamental to a position and all employees in the position must perform it."[47] While not itself determinative, the ADA instructs courts to consider "the employer's judgment as to what functions of a job are essential."[48]

Provstgaard's job as an echocardiograph and vascular technician required him to take ultrasound scans of patients' hearts and peripheral vascular systems to detect health problems like blood clots and aneurysms. He then had to prepare reports including measurements taken from the images and descriptions of what he saw in the images. His failure to correctly identify an issue or to take the correct image could have had serious implications for patient care and safety. For example, failure to identify an aneurysm, a stenosis, or a blood clot could have had fatal results.

The undisputed evidence establishes that Provstgaard was not satisfactorily performing the essential functions of his position. Provstgaard made numerous, repeated errors throughout his ten-week tenure at the Hospital. He repeatedly failed to identify blood clots or properly scan certain veins. He also had a pattern of committing measurement and reporting errors. Indeed, the Medical Director of the Peripheral Vascular Department testified that the frequency of the

---

[46] See Quinney v. Swire Coca-Cola, USA, 2009 WL 1393118, at *6 (D. Utah May 18, 2009) ("If the court 'concludes that the individual is not able to perform the essential functions of the job at issue, the court must determine whether any reasonable accommodation by the employer would enable the individual to perform those functions.'" (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999))).

[47] Id.

[48] 42 U.S.C. § 12111(8).

errors were "alarming" and "beyond anything [he] had ever experienced."[49]  Provstgaard does

not dispute that he committed numerous errors.  Nor does he contest that his errors could have

had life-threatening results.  And he even admits that "[he] was not performing in a satisfactory

manner."[50]  In short, no reasonable jury could find that Provstgaard could perform the essential

functions of an echocardiograph and vascular technician at the Hospital.

### 2.  Reasonable Accommodation

"[B]efore an individual can be deemed not 'otherwise qualified' the employer must make

an effort to accommodate the employee's disability."[51]  The court therefore examines whether

Provstgaard could perform the essential functions of his job with reasonable accommodation.

The ADA articulates two types of accommodation that are relevant here.  First, "whether

a reasonable accommodation would enable the employee to do the particular job.  Additional

training might be a reasonable accommodation for this purpose."[52]  And second, "whether the

employee could be transferred to other work [within the company] which could be done with or

without accommodation."[53]  To assist parties in finding reasonable accommodation for disabled

employees, "[t]he federal regulations implementing the ADA envision an interactive process that

requires participation by both parties."[54]

> To determine the appropriate reasonable accommodation it may be necessary
> for the covered entity to initiate an informal, interactive process with the
> individual with a disability in need of the accommodation.  This process should
> identify the precise limitations resulting from the disability and potential
> reasonable accommodations that could overcome those limitations.[55]

---

[49] Decl. of Steven Merell, M.D. (Dkt. 51, Ex. 3), ¶ 11.

[50] Dkt. 57 at 5.

[51] *Wilkerson v. Shinseki*, 606 F.3d 1256, 1265 (10th Cir. 2010).

[52] *Id.* (citation omitted) (internal quotation marks omitted).

[53] *Id.* (citation omitted) (internal quotation marks omitted).

[54] *Midland Brake*, 180 F.3d at 1171 (citation omitted) (internal quotation marks omitted); *see also id.* at 1172 ("The interactive process is typically an essential component of the process by which a reasonable accommodation can be determined.").

[55] 29 C.F.R. § 1630.2(*o*)(3).

To trigger an employer's obligation to provide an accommodation or to participate in the interactive process, an employee must notify the employer of his disability, and make a clear and direct request for an accommodation.[56]  Once an employee triggers an employer's duty to engage in the interactive process, "both parties have an obligation to proceed in a reasonably interactive manner," and to engage in "good-faith communications" to find a reasonable accommodation.[57] That said, "no rules of universal application" govern the shape of the interactive process, which "will necessarily vary from situation to situation."[58]

Here, Provstgaard first argues that even though he fulfilled his obligation to initiate the interactive process, the Hospital failed to participate in that process.  Provstgaard testified that he told Rayburn, Cannon, and Gonzales during his interviews that he had suffered a stroke, that he had difficulty using his right hand, and that he had short-term memory loss.  He further testified that he told the interviewers that he would need to be given instructions and taught the protocols more than once.  Provstgaard argues that although he adequately put the Hospital on notice of his disability and requested an accommodation, "[a]t no time did [his] supervisors sit down with him to discuss his disabilities and how they may be accommodated."[59]

But Provstgaard overlooks his own testimony that he revealed his disabilities during the interviews "with the understanding that there would be latitude given for [him], [his] training, and learning of [his] limitations."[60]  And that "assurance was given [during the interviews] that

---

[56] *See Midland Brake*, 180 F.3d at 1171–72; *see also C.R. England*, 644 F.3d at 1049 (stating that "before an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice"); *id.* ("Although the notice or request does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' it nonetheless must make clear that the employee wants assistance *for his or her disability*." (citation omitted) (internal quotation marks omitted)).

[57] *Midland Brake*, 180 F.3d at 1172.

[58] *Id.* at 1173.

[59] Dkt. 57 at 6.

[60] Todd Provstgaard Depo. (Dkt. 57, Ex. A), at 73:11–15.

there would be latitude given more so than average to work through [his] limitations."[61]  The court infers that this understanding and assurance was the result of good-faith communications between Provstgaard and his supervisors at the interviews, and concludes that a reasonable jury could not conclude otherwise.

Even if there is a genuine dispute of fact concerning whether the Hospital participated in the interactive process,[62] failure to engage in the interactive process is not an independent basis for imposing liability.[63]  This is especially so where an employer provides a disabled employee with a reasonable accommodation regardless of any interactive process.[64]  Provstgaard argues that the Hospital failed to reasonably accommodate his disabilities, even though he requested that he receive additional training, more time to learn the protocols, and broader latitude to learn by trial and error.[65]

But the undisputed evidence shows that, while a similarly experienced technician would usually receive two weeks of training in each of the echocardiograph and vascular departments, Provstgaard's training lasted his entire ten-week tenure at the Hospital.  In those ten weeks, he received one day of orientation in each department, followed by three days of shadowing other employees in each department.  While shadowing, he was free to inquire about the equipment, the patients, and the examinations.  He also received and reviewed the protocols for each

---

[61] *Id.* at 75:17–19.

[62] *See Midland Brake*, 180 F.3d at 1174 (stating that summary judgment would be premature if there a genuine dispute regarding whether the employer participated in good-faith discussions to secure a reasonable accommodation for the disabled employee).

[63] *See Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1265 (10th Cir. 2009); *see also Lowe v. Indep. Sch. Dist. No. 1*, 363 F. App'x 548, 552 (10th Cir. 2010) (unpublished) (acknowledging that "the interactive process is merely a *means* to achieve a reasonable accommodation rather than an independent substantive requirement"); *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 292 (7th Cir. 2015) (stating that "failure of the interactive process is not an independent basis for liability under the ADA" (citation omitted) (internal quotation marks omitted)).

[64] *See Wilkerson*, 606 F.3d at 1265 (concluding that the employer made reasonable accommodations for the employee without analyzing whether the employer engaged in the interactive process).

[65] *See id.* (stating that "[a]dditional training might be a reasonable accommodation" that would enable an employee to perform the essential functions of his or her position).

department, and Cannon further reviewed with him the protocols for the vascular department one or two additional times.

He then worked all but a few of his remaining shifts with another coworker, who would supervise his work and correct his errors, even though "the assignment of another employee to help perform the duties of a job is not a reasonable accommodation."[66]  Cannon also scheduled an extra employee to work and earn overtime when Provstgaard was working in the vascular department to supervise his work and mitigate patient risk, even though an "accommodation that would require other employees to work harder is [also] unreasonable."[67]  Further, the echocardiograph research coordinator showed Provstgaard how to perform a complete echocardiograph report.  And Cannon talked to him several times about missing blood clots, and met with him at least twice to provide extra coaching.  Cannon and Rayburn also met with him together on another occasion to discuss his errors, while Gonzales held coaching sessions with him in late May and into early June.

Considering that the Hospital provided Provstgaard with extensive training before he resigned, that Provstgaard had a diminished ability to recall information due to his short-term memory issues, and that errors by ultrasound technicians like Provstgaard pose serious safety risks to patients, the court concludes that the accommodation and training the Hospital provided Provstgaard was reasonable under the circumstances as a matter of law.[68]  And because Provstgaard could not perform the essential functions of his position, as discussed above, the

---

[66] *Quinney*, 2009 WL 1393118, at *7; *see also Stern*, 788 F.3d at 289 (reiterating that "to have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation").

[67] *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1121 n.3 (10th Cir. 2004); *see also Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) (holding that "[a]n accommodation that would result in other employees having to work harder or longer hours is not required" under the ADA).

[68] *See Stern*, 788 F.3d at 295 (stating that "it is entirely proper for an employer assessing the reasonableness of a proposed accommodation to consider the sensitive nature of the employee's position and the potential safety and liability risks involved").

court also concludes that Provstgaard cannot establish a prima facie case of disability discrimination for his constructive discharge and failure-to accommodate claims because he was not qualified to perform the essential functions of his job with or without reasonable accommodation.

Provstgaard argues that he should have received more constructive feedback instead of being written-up for his numerous, repeated errors.  But Provstgaard ignores that the write-ups themselves were a form constructive feedback, identifying his errors and articulating a plan-of-action moving forward.  Indeed, the gravamen of Provstgaard's argument is that the training he received was ineffective and that he did not receive his preferred amount of training.  Yet he cites no authority supporting the proposition that the Hospital was required under the ADA to provide him with his preferred accommodation, let alone that it was required to provide him with an amount of training that was to his liking.  The ADA requires only that the Hospital provide him with a reasonable accommodation, and the evidence demonstrates that it did.

Provstgaard further insists that if the Hospital had given him more time and provided him with more training, then his performance would have eventually improved.  In support, he points to Frank's report that he showed improvement during their second day working together.[69]  Even if Provstgaard showed improvement that day, an employer is not required to wait indefinitely for an employee to begin performing the essential functions of his position.[70]  As the Fourth Circuit observed, the ADA's provisions "contain no reference to an individual's *future* ability to perform the essential functions of his position.  To the contrary, they are formulated entirely in the present

---

[69] Provstgaard also contends that his success in his positions at the facilities in Hawaii and Alaska show that he could have performed the essential functions of his job at the Hospital with a reasonable accommodation.  But he offers no evidence of what the essential functions of his job were at either facility, or whether either facility provided him an accommodation of any kind.

[70] *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995).

tense, framing the precise issue as whether an individual 'can' (not 'will be able to') perform the job with reasonable accommodation."[71]   But even if that was not the case, Provstgaard provides no evidence that more training would have enabled him to perform the essential functions of his position—he instead offers speculation and hope that one day he would have been able to do so. This is insufficient.

Finally, notwithstanding that Provstgaard did not request these accommodations during his employment, he argues that the Hospital should have considered restructuring his position or reassigning him to another position.[72]   He contends that the Hospital could have restructured his position—or created a new position for him—so he was working only in the echocardiograph or the vascular department.   But the ADA does not require an employer to create a new job for a disabled employee.[73]   And "an employer is [similarly] not required to accommodate a disabled worker by modifying or eliminating an essential function of the job."[74]   Because Provstgaard's responsibilities in each department were essential functions of his position, his suggested job restructuring is not a reasonable accommodation.   Provstgaard also maintains that the Hospital could have reassigned him to another position in the Hospital.   A plaintiff "bears the burden of identifying a specific vacant position to which he could have reasonably been reassigned."[75]   Instead of identifying a specific vacant position in the Hospital, Provstgaard offers speculation that, because the Hospital is a large company that continuously has new job openings, it could have transferred him to, for example, a starting ultrasound position.   Provstgaard has not met his burden to show that reassignment would have been reasonable in these circumstances.

---

[71] *Id.*
[72] *See* 42 U.S.C. § 12111(9) (stating a reasonable accommodation may include "job restructuring" or "reassignment to a vacant position").
[73] *Midland Brake*, 180 F.3d at 1174.
[74] *Hennagir*, 587 F.3d at 1264.
[75] *Koessel*, 717 F.3d at 745.

Provstgaard has not shown that he was qualified to perform the essential functions of his position with or without reasonable accommodation.  As a result, he cannot establish a prima facie case of disability discrimination under the ADA with respect to his constructive discharge and failure-to-accommodate claims.

## B.  Failure to Hire

The court now turns to Provstgaard's claim that the Hospital unlawfully discriminated against him when it failed to hire him for any of the over-twenty positions for which he applied after resigning.[76]  The ADA protects employees and job applicants, including a former employee with a disability who applies for a position he desires.[77]

Provstgaard contends that the Hospital failed to hire him due to Rayburn's discriminatory reference, in which she ranked Provstgaard's performance as "poor" and recommended that he not be rehired.  She cited his "[n]umerous clinical errors," his "avalanche of behavior problems and clinical errors," and his inability to "remember[] things" or "retain information" even though he had been trained and "retrained numerous times."[78]

For the purposes of this discussion, the court assumes that Provstgaard can establish a prima facie case of discrimination.[79]  Applying the *McDonnell Douglas* burden-shifting test, the court now examines whether the Hospital has articulated a legitimate, nondiscriminatory reason

---

[76] To the extent any of the positions for which Provstgaard applied require an employee to perform the same essential functions as his echocardiograph-vascular ultrasound technician position, the court concludes for the reasons stated above that Provstgaard was not qualified.  The court's discussion in this section is directed toward the positions for which Provstgaard applied that have different essential functions.

[77] *McKenzie v. Dovala*, 242 F.3d 967, 974 (10th Cir. 2001); *see also Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 628 (10th Cir. 2012) ("Discrete unlawful practices include termination, failure to promote, denial of transfer, and refusal to hire.").

[78] Reference Form (Dkt. 51, Ex. 10).

[79] *See C.R. England*, 644 F.3d at 1043 (assuming, without deciding, that the employee established a prima facie case of disability discrimination under the ADA).

for refusing to rehire Provstgaard, and, if so, whether Provstgaard can show that the Hospital's stated reasons are merely "pretextual."[80]

The Hospital states that it refused to rehire Provstgaard because he committed numerous, dangerous clinical errors; he was trained numerous times yet did not meaningfully improve; and he displayed behavioral problems, such as disappearing during shifts without notifying anyone. "These stated reasons—which on their face are legitimate and non-discriminatory—satisfy [the Hospital's] 'exceedingly light' burden."[81]

The burden now shifts to Provstgaard to offer evidence demonstrating that the Hospital's offered reasons are merely pretext for discriminatory intent.[82]  "A plaintiff can establish pretext by showing [that] the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief."[83]  Provstgaard, however, has failed to present any evidence suggesting that the Hospital's proffered rationale for refusing to rehire him was pretextual.  As a result, his claim that the Hospital refused to hire him based on discriminatory animus fails.

Provstgaard's claims that the Hospital discriminated against him based on his disability fail as a matter of law.

## III. Retaliation

Having concluded that Provstgaard's disability discrimination claims fail as a matter of law, the court now examines his claim that the Hospital retaliated against him in violation of the ADA.  The ADA commands that "[n]o person shall discriminate against any individual because

---

[80] *See id.* at 1038.

[81] *Id.* at 1043 (quoting *Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1013 (10th Cir. 2002)).

[82] *See id.* at 1038; *see also Mackenzie*, 414 F.3d at 1276 (recognizing that an employee must offer evidence showing that the employer's proffered legitimate, nondiscriminatory reason for its actions was pretextual).

[83] *C.R. England*, 644 F.3d at 1038–39.

such individual has opposed any act or practice made unlawful by this chapter or because such

individual made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter."[84]

To establish a prima facie case of retaliation, a plaintiff must demonstrate "(1) that he

engaged in protected opposition to discrimination, (2) that a reasonable employee would have

found the challenged action materially adverse, and (3) that a causal connection existed between

the protected activity and the materially adverse action."[85]  Like disability discrimination claims

under the ADA, courts analyze retaliation claims lacking direct evidence of retaliation under the

*McDonnell Douglas* burden-shifting framework.[86]

Here, Provstgaard engaged in protected activity when he requested an accommodation

during his interviews,[87] and when he filed charges of discrimination with the EEOC.[88]  The

dispute concerns whether Provstgaard suffered a materially adverse employment action.  He

contends that he suffered four such actions.

"To be materially adverse, an action must be sufficient to 'dissuade a reasonable worker

from making or supporting a charge of discrimination.'"[89]  "While the employer's conduct need

not affect the terms and conditions of employment," the injury does have to rise to a "level of

seriousness."[90]  Moreover, whether the conduct "interfered with [the employee's] ability to do

[his] job is probative of whether the [conduct] was serious enough to dissuade a reasonable

---

[84] 42 U.S.C. § 12203(a).

[85] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011) (citation omitted) (internal quotation marks omitted).

[86] *Id.*

[87] *See Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007) (recognizing that the Tenth Circuit has "treated requests for reasonable accommodation as protected activity under the ADA").

[88] *See C.R. England*, 644 F.3d at 1051 (treating an EEOC complaint as protected activity under the ADA).

[89] *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

[90] *Id.* (citation omitted) (internal quotation marks omitted).

worker from filing or pursuing a discrimination claim."[91]  This is an objective inquiry, not one that is "based on a plaintiff's personal feelings."[92]

Provstgaard first argues that the Hospital's decision to place him in two departments instead of one was materially adverse.  But the undisputed evidence shows that the Hospital offered him a joint echocardiograph-vascular position after his second interview, and that he accepted the position knowing that it required him to work in both departments.  And in any event, placing an ultrasound technician with over twenty-five years of experience in a joint position would not dissuade a reasonable employee from pursing a claim of discrimination.

Provstgaard also argues that he suffered a materially adverse action when the Hospital failed to reasonably accommodate him, and instead wrote him up for his errors.  But as stated above, the Hospital provided him with a reasonable accommodation in the form of extensive training.  That his performance did not meaningfully improve despite this extensive training is not evidence of retaliatory intent.  And although the Hospital issued him two written warnings, those alone would not dissuade a reasonable worker from making a charge of discrimination, especially where the write-ups were constructive in nature and included a plan of action moving forward.

Provstgaard next insists that the Hospital constructively discharged him when Rayburn and the Human Resources representative presented him with a final written warning on June 11, 2012.  "Constructive discharge occurs when an employer unlawfully creates working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign."[93]

---

[91] *Id.* at 640.
[92] *Id.* at 638 (citation omitted) (internal quotation marks omitted).
[93] *Strickland v. United Parcel Serv. Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009) (citation omitted) (internal quotation marks omitted).

In effect, a plaintiff must show he had "no other choice but to quit."[94]  Constructive discharge claims are analyzed under an objective standard—"the employer's subjective intent and the employee's subjective views on the situation are irrelevant."[95]

Under this standard, "[i]f an employee resigns of [his] own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."[96] Courts examine four factors when analyzing whether an employee voluntarily resigned: whether (1) he "received some alternative to resignation," (2) he "understood the nature of his choice," (3) he "had a reasonable time in which to choose," and (4) he "was permitted to select the effective date of his resignation."[97]  Whether a constructive discharge occurred is a factual question.[98]  Applying these factors, the court concludes that Provstgaard voluntarily resigned on June 11, 2012, and that no reasonable jury could find that Provstgaard's working conditions were so intolerable that he had no other choice but to quit.

First, Provstgaard had an alternative to resignation.  The final warning did not force him to choose between resignation and immediate termination.  It instead provided that "[c]ontinued performance concerns will result in termination."[99]  In other words, he had the option to continue working, with the *possibility* of termination if his performance did not improve.[100]

---

[94] *Mackenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005).

[95] *Strickland*, 555 F.3d at 1228.

[96] *Walker v. United Parcel Serv. of Am., Inc.*, 76 F. App'x 881, 890 (10th Cir. 2003) (unpublished) (quoting *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858 (10th Cir. 2000)).

[97] *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000).  Although the issue in *Lighton* was whether defendants denied plaintiff "a property right or liberty interest in his continued employment at the University by constructively terminating him without due process of law," *id.* at 1221, and not whether defendants retaliated against plaintiff, the court finds that the four factors articulated in *Lighton* provide a helpful framework for analyzing whether an employer constructively discharged an employee under the ADA.

[98] *Strickland*, 555 F.3d at 1228.

[99] Final Written Warning (Dkt. 51, Ex. 1).

[100] *See Lighton*, 209 F.3d at 1222 & n.9 (concluding that plaintiff had an alternative to resignation where he had a choice between signing a settlement agreement and possibly facing disciplinary proceedings).

Provstgaard argues that he was left with no other alternative because the Hospital gave him a final warning and told him he was endangering patients, even though it failed to provide him with adequate training and time to learn the new protocols.  But as discussed, the Hospital provided him with adequate training.  And the warnings were based on his admitted errors and on his employer's honest evaluation of his performance.[101]  Under these circumstances, he was not left with no other choice but to quit.

Second, he understood the nature of his choice.  He testified that he voluntarily quit, even though there was no indication that his salary, benefits, or hours would have been affected by the final warning.  He also told potential employers and his insurer that he chose to resign because he could not perform the essential functions of the position.

Third, he had a reasonable time in which to make a decision.  To be sure, the Human Resources representative asked him if he would put his resignation in writing when he asked if there was any reason for him to return to work the following week.  But there is no evidence that he was coerced into resigning that day.  Nor is there evidence that he could not have answered the representative "no."  And his testimony that he voluntarily resigned suggests that he was not forced to resign within a certain period.  Fourth, he was permitted to choose the effective date of his resignation.  In choosing to resign even though it was not offered as an option, he chose the effective date of his resignation.

Looking beyond the four factors, Provstgaard wrote on the final warning that he was not able to continue because health concerns prevented him from adequately performing.  He also expressed gratitude toward management and his coworkers for their efforts and genuine concern

---

[101] *See, e.g., Mackenzie*, 414 F.3d at 1281–82 (concluding that no reasonable jury could find that plaintiff was constructively discharged, because he received disciplinary actions that "were a direct result of [his] repeated misconduct").

on his behalf.  These statements suggest that he voluntarily resigned—not that he was left with no other choice but to quit.  The court concludes that no reasonable jury could find that he was constructively discharged.

Lastly, Provstgaard argues that the Hospital's failure to hire him was materially adverse. But even assuming he can establish a prima facie case of retaliation on this ground, he again presents no evidence that the Hospital's legitimate, nondiscriminatory reasons for not hiring him are pretextual.

Provstgaard's disability discrimination and retaliation claims fail as a matter of law.

## CONCLUSION

For the reasons stated, the court GRANTS the Hospital's Motion for Summary Judgment (Dkt. 51).  The Clerk of Court is directed to close the case.

SO ORDERED this 18th day of October, 2016.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge